UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

The Cincinnati Insurance Company,    )    Civil Action No. 2:18-cv-657-BHH
)
Plaintiff,    )
)
vs.    )
)
)    **OPINION AND ORDER**
Charlotte Paint Company, Inc. d/b/a Pro-    )
Tec Weatherproofing, and Southeastern    )
Wall Systems, Inc.    )
)
)
Defendants.    )
_____    )

This matter is before the Court on Plaintiff The Cincinnati Insurance Company's ("CIC") motion for summary judgment (ECF No. 35), and Defendant Charlotte Paint Company, Inc. doing business as Pro-Tec Weatherproofing's ("Pro-Tec") motion for summary judgment (ECF No. 43). For the reasons set forth in this Order, CIC's motion is granted and Pro-Tec's motion is denied.

## BACKGROUND

CIC brought this declaratory judgment action to determine coverage under a commercial general liability (CGL) policy issued by CIC to Defendant Southeastern Wall Systems, Inc. ( "Southeastern"). Pro-Tec is the plaintiff in an underlying action against Southeastern, *Charlotte Paint Company, Inc., d/b/a Pro-Tec Weatherproofing, vs. Southeastern Wall Systems, Inc.*, No. 2016-CP-10-02204, pending in the Court of Common Pleas for Charleston County (the "Underlying Action").

**Pro-Tec's Allegations Against Southeastern**

In the Underlying Action, Pro-Tec alleged it contracted with Shipwatch at Wild Dunes Homeowners Association ("Shipwatch HOA") to perform a repair project on two

1

condominium buildings in September 2014 ("Shipwatch Project"). (Underlying Compl. ¶ 5, ECF No. 35-2.) Pro-Tec's work under the contract included replacing windows, sliding glass doors, metal roofs, metal stud wall framing, and stucco cladding. (*Id.*)

Pro-Tec entered into a subcontract with Southeastern for the replacement of the stucco cladding on the buildings. (*Id.* ¶ 6.) The subcontract required that Southeastern protect surfaces adjacent to its work such as windows, doors, ceilings, and slabs. (*Id.*) Other subcontractors removed existing stucco cladding, made framing repairs, installed new windows and sliding glass doors, and installed flashing around window and door openings with a "Blueskin" waterproof membrane. (*Id.* ¶ 8.) Southeastern allegedly began its stucco installation work in February 2015 and substantially completed its work in the summer of 2015. (*Id.* ¶¶ 8–9.)

After Southeastern substantially completed its work, during water testing of window units, the Project Engineer discovered cuts in the Blueskin membrane flashing around certain window openings. (*Id.* ¶ 9.) These cuts allegedly damaged the Blueskin waterproof membrane and the wall sheathing—a product called DensGlass.[1] (*Id.*) The Project Engineer and Shipwatch HOA directed Pro-Tec to develop a repair plan, which repairs involved removal of some stucco around the windows and sliding glass doors, repairing the Blueskin, replacing the stucco, and restoring sealants at all affected locations. (*Id.*)

---

[1] The underlying complaint states that the cuts "damaged the waterproofing membrane and also resulted in leaks and other damage to wall sheathing, as well as components of window and door units." (Underlying Compl. ¶ 9.) However, CIC notes in its briefing: (1) the allegation that the cuts in the Blueskin and DensGlass caused water damage to other building components was not substantiated by any evidence; (2) Pro-Tec's expert—Al Schweickhardt, PE, of Applied Building Sciences, Inc.—did not testify to any such resulting damage; and (3) no repair estimate for any such damage has been produced. (*See* Schweickhardt Dep. at 51 & 79, ECF No. 35-7 (describing damage itemized in expert report); EDT Report at 9–10, ECF No. 35-6 (itemizing subsequent repairs and noting that relevant documents revealed no water damages to building components from water intrusion at the cuts in the Blueskin or DensGlass).) Moreover, Pro-Tec does not argue that any such water damage to other building components occurred. (*See* ECF Nos. 40 & 43-1.) Accordingly, the Court will not consider any purported water damage to other building components.

2

Pro-Tec allegedly performed these repairs between September 2015 and February 2016. (*Id.* ¶ 10.)

Pro-Tec alleged that the cuts were made in the Blueskin during the installation of the stucco, when Southeastern personnel cut or trimmed felt paper prior to the installation of stucco and casing bead, and/or when its personnel scraped or cleaned stucco debris from window and sliding glass door joint gaps prior to the installation of sealant joints. (*Id.* ¶ 11; *see* "Discussion of Relevant Building Components, Stucco Installation, and Repairs" *infra* at 4–9.) Pro-Tec further alleges that Southeastern failed to repair the damage to the Blueskin flashing or to otherwise cooperate with Pro-Tec in correcting the damage. (*Id.* ¶ 12.) Pro-Tec contends it suffered damages as a result of Southeastern's actions, including more than $1.5 million in repair costs and additional liquidated damages assessed against Pro-Tec under its contract with Shipwatch HOA due to delays. (*Id.* ¶ 14.) Pro-Tec asserted causes of action for breach of contract, breach of warranty, negligence, and contractual indemnity against Southeastern in the Underlying Action. (*Id.* ¶¶ 19–38.) CIC is defending Southeastern in the Underlying Action under reservation of rights. (*See* ECF No. 35-3.) By consent order, the Underlying Action has been stayed until this declaratory judgment action is resolved. (*See* ECF No. 35-4.)

**Evidence Regarding Southeastern's Claim for Indemnification**

Pro-Tec's claims against Southeastern in the Underlying Action are largely based upon the deposition testimony and report of Pro-Tec's expert, Al Schweickhardt, P.E. ("Schweickhardt"), of Applied Building Sciences, Inc. ("ABS"). Pro-Tec also relies upon Schweickhardt as its expert in this declaratory judgment action. (*See* ECF No. 24.) CIC also retained an expert, Glenn Stewart, M.E., P.E. ("Stewart"), of Engineering Design &

Testing Corp. ("EDT"). (*See* ECF No. 28.) Both experts have produced reports and been deposed in this action. (ABS Report to Pro-Tec dated Feb. 5, 2016 ("ABS Report"), ECF No. 35-5; EDT Report to CIC dated Mar. 13, 2019 ("EDT Report"), ECF No. 35-6; Schweickhardt Dep., ECF No. 35-7; Stewart Dep., ECF No. 35-8.) Schweickhardt testified that he did not disagree with Stewart's report. (Schweickhardt Dep. at 85–86.) Stewart testified he generally agreed with Schweickhardt, except that he expressed no opinion as to Southeastern's liability for causing the cuts. (Stewart Dep. at 11–14.)

**Discussion of Relevant Building Components, Stucco Installation, and Repairs**

Southeastern was the stucco subcontractor for the Shipwatch Project. (Schweickhardt Dep. at 16.) Before Southeastern began its stucco work, other contractors installed the DensGlass sheathing, the Blueskin membrane, and most of the windows and doors. (*Id.* at 17–18.) Photographs depict the condition of the substrate before Southeastern began its work. (Stewart Dep. at 22–23 & Ex. 5, ECF No. 35-8 at 7 & 9.)

DensGlass sheathing generally comes in 4'x8' sheets that are installed vertically to the exterior face of the walls of buildings under construction.[2] DensGlass sheathing has a facing on its surface that enables it to function as part of a building's waterproofing system. (Schweickhardt Dep. at 30.)

Blueskin is a self-adhered air and vapor barrier membrane that is used as a type of flashing system.[3] (*Id.* at 16.) For purposes of the Shipwatch Project, Blueskin was used to flash the rough openings for the windows and doors. (*Id.* at 17.) The Blueskin extended over the surface of the DensGlass sheathing for a few inches in a border around the window and door openings. (*Id.* at 31.) The purpose of the Blueskin is to direct water that

---

[2] *See* https://buildgp.com/product/densglass-gypsum-wall-sheathing/ (last visited Oct. 6, 2020).
[3] *See* http://www.henryblueskin.com/ (last visited Oct. 6, 2020).

may get in around the windows and doors to other flashing which, in turn, directs the water to the exterior of the building. (*Id.*)

The windows and doors are installed into the rough openings after the Blueskin is installed. (*Id.* at 17.) Most of the windows and doors were already installed when Southeastern began its stucco installation work on the Shipwatch Project. (*Id.* at 30.) Southeastern's scope of work was performed in five stages, which included installation of: (1) the felt, (2) the casing bead, (3) the lath, (4) the plaster, and (5) the finish coat. (*Id.* at 28–29.)

**Felt:** The felt is a water-resistant paper. (*Id.* at 29.) It serves the dual purposes of directing incidental moisture to the building exterior and acting as bond breaker between the stucco and the substrate. (*Id.*) The felt was installed onto the substrate, in this case DensGlass sheathing and whatever was on the DensGlass, including the Blueskin around the window and door openings. (*Id.* at 29, 32.) The installation of the felt includes the task of cutting the felt. (*Id.* at 29.) To accomplish this, a stucco contractor typically rolls the felt out over the wall and then cuts out the window openings. (*Id.* at 66–67.) A contractor may initially make a rough cut within the window opening, but ultimately the felt must be cut back to leave the window opening relatively free of paper. (*Id.* at 67–68.)

**Casing Bead:** The casing bead forms a boundary between the stucco and adjacent surfaces such as windows and doors. (*Id.* at 33.) The casing bead is not composed of caulking or sealant but is rather made of galvanized metal folded into an "L" shape with a piece of lath attached. (*Id.*) CIC contends, and Defendants do not dispute, that AMICO X-66 Casing Bead or a similar product was used.[4] The casing bead is

---

[4] *See* https://amicoglobal.com/x-66-casing-bead/ (last visited Oct. 7, 2020).

installed over the felt with the lath against the wall and the "L"-shaped frame running parallel to the window and door openings. The casing bead is not abutted directly to the windows and doors—a gap of 1/2" to 5/8" is left between the casing bead and the windows and doors. (*Id.* at 33-34; *see also* ABS Report at 4 (depicting 1/2" gap).)

**Lath:** The lath is expanded galvanized wire. (Schweickhardt Dep. at 34.) It looks like metal webbing. (*See* ABS Report at 7–8 (depicting lath exposed during Mr. Schweickhardt's February 2016 investigation of the Shipwatch Project jobsite).) The lath is screwed to the wall over the felt within the framework created by the casing bead, and it provides support for the stucco. (Schweickhardt Dep. at 34–35.)

**Plaster:** The stucco plaster contains Portland cement, sand, and other proprietary materials. (*Id.* at 35-36.) It embeds the lath. (*Id.* at 36.) Two coats of stucco are usually installed: the scratch coat and the brown coat. (*Id.*) The casing bead forms the boundary between the stucco and the windows and doors. (*Id.*)

**Finish Coat:** The final step is a finish coat that forms the outer layer of the stucco. (*Id.*) The finish coat may have an aesthetic waterproof coating over it. (*Id.* at 43–44.)

When a stucco contractor is installing the stucco, the contractor must keep stucco from accumulating in the 1/2" to 5/8" gap between the casing bead and the windows and doors. (*Id.* at 38.) This "joint gap" is to be filled with backer rod and sealant. (*Id.*) The backer rod is a cylindrical foam material that prevents the sealant from adhering to the back of the gap. (*Id.* at 40.) The sealant allows the stucco and the windows/doors, which are composed of different types of materials, to move separately while preventing water and pests from getting into the gap. (*Id.*) Mr. Schweickhardt stated that based on his discussions with Pro-Tec's representative and his review of the contract with

Southeastern, that it was Southeastern's responsibility to leave the joint gap free of stucco. (*Id.* at 38.) Another subcontractor, Ward's Waterproofing, was tasked with installation of the backer rod and sealant into the gap. (*Id.* at 39.)

Pro-Tec hired Mr. Schweickhardt to investigate the cause of the cuts in the Blueskin that were discovered during window testing. (*Id.* at 20, 26; ABS Report at 1.) Schweickhardt concluded that the cuts in the Blueskin were made in two ways: (1) the majority of cuts were made when a utility knife being used to cut the felt at the window and door openings cut through the felt into the Blueskin, and in some cases into the DensGlass facer underneath the Blueskin (Schweickhardt Dep. at 46–47, 54, 78–79); (2) the remaining 23% of the cuts in the Blueskin were made when the stucco was being cleaned from the joint gap between the casing bead and the windows/doors (*Id.* at 46–47, 56–57). (*See* ABS Report at 3, 6 (itemizing the location and distribution of the cuts in the Blueskin and noting that many of those cuts also exhibited cuts and gouges through the fiberglass surface of the DensGlass sheathing).) The ABS Report did not identify any moisture-related damage to other building components that necessitated repair. (EDT Report at 4.) Pro-Tec has not produced any documentation of water damage caused by the cuts in the Blueskin and DensGlass. (*See id.* at 8–9.)

Schweickhardt opined that the cuts in the Blueskin and DensGlass occurred while Southeastern was performing its work. (Schweickhardt Dep. at 57–58.) Specifically, he concluded the cuts were made while the felt was being cut and while stucco was being cleaned from the joint gap. (*Id.* at 54–57.)

The repair methodology identified by ABS consisted of removing materials to gain access to the areas where the cuts were made, repairing the cuts in the Blueskin and

DensGlass, and reinstalling the exterior components. (EDT Report at 9.) In the joint gaps, the backer rod and sealant were removed. (ABS Report at 2.) Where Blueskin damage was observed, a six-inch section of stucco was removed, and the casing bead and lath pulled out of the way. (*Id.*) The cuts in the DensGlass were repaired with a spray-on primer adhesive. (*Id.*; Schweickhardt Dep. at 76.) The cuts in the Blueskin were repaired by adding a strip of Blueskin and using Henry's Liquid Flash. (ABS Report at 2.) Henry's Liquid Flash is a liquid product that is applied with a brush or a putty knife. (Schweickhardt Dep. at 43.) After these repairs were made, the casing bead, lath, stucco, backer rod, and sealant that had been removed were reinstalled. (Schweickhardt Dep. at 81–82; ABS Report at 2.) Lastly, an All-Guard coating was applied for cosmetic purposes, to blend the repaired areas with the stucco that was not removed. (Schweickhardt Dep. at 44, 82; ABS Report at 2.)

Both experts agree that the Blueskin and the DensGlass sheathing were pre-existing work that Southeastern was required to protect when it installed the stucco. (Schweickhardt Dep. at 57–59, 74; Stewart Dep. at 10, 23–24.) Southeastern's subcontract with Pro-Tec required Southeastern to protect all adjoining surfaces. (Subcontract, ECF No. 1-2 at 3 ("The Contractor and the Subcontractor agree as follows, . . . [p]ro[t]ection of all adjoining surfaces . . . .").)

Mr. Schweickhardt stated that the Blueskin was an adjoining surface and therefore it was to be protected. (Schweickhardt Dep. at 58.) Subcontractors are not supposed to damage pre-existing work when they perform their work. (*Id.*) Southeastern's scope of work required it to install the felt, casing bead, lath, and stucco over the Blueskin and DensGlass sheathing. (Schweickhardt Dep. at 84–85; Stewart Dep. at 17–18.) Except for

isolated locations unrelated to this litigation, the Blueskin was not Southeastern's work product because Southeastern did not install it. (*Id.* at 14–17.) Mr. Stewart stated that protection of the Blueskin was part of Southeastern's scope of work because the Blueskin was an adjoining surface. (*Id.* at 23–24; EDT Report at 8.)

General industry standard requires subcontractors to repair damage they cause to adjoining surfaces. (Schweickhardt Dep. at 59.) A subcontractor may have this responsibility even in the absence of written contract. (*Id.* at 85; Stewart Dep. at 24.)

**The Insurance Policy at Issue**

CIC issued policy number EPP 009 69 57 to Southeastern ("the Policy"). (ECF No. 35-12.) The Policy included commercial general liability ("CGL") coverage and it was in effect from September 14, 2014 to September 15, 2015. (*Id.* at 1.) The Policy limits are $1,000,000 per occurrence and $2,000,000 in the aggregate. (*Id.* at 15.) The Policy provides in relevant part:

**SECTION I – COVERAGES**

**COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. . . . .

b. This insurance applies to "bodily injury" and "property damage" only if:

**(1)** The "bodily injury" or "property damage" is caused by an "occurrence" . . . ;
**(2)** The "bodily injury" or "property damage" occurs during the policy period . . . .

. . . .

**2. Exclusions**

This insurance does not apply to:

. . . .

**j. Damage To Property**

"Property damage" to:

. . . .

**(5)** That particular part of real property on which you . . . are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired, or replaced because "your work" was incorrectly performed on it.

. . . .

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products completed operations hazard."

. . . .

**SECTION V – DEFINITIONS**

. . . .

**16.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

. . . .

**19.** "Products-completed operations hazard":

**a.** Includes all . . . "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

. . . .

**(2)** Work that has not yet been completed or abandoned.

However, "your work" will be deemed completed at the earliest of the following times:

> **(a)** When all of the work called for in your contract has been completed; or

> **(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site; or

> **(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

. . . .

**20.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the "occurrence" that caused it.

. . . .

**26.** "Your work":

**a.** Means:

> **(1)** Work or operations performed by you or on your behalf; and

> **(2)** Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes**:**

> **(1)** Warranties or representations made at any time with

respect to the fitness, quality, durability, performance or use of "your work", and

**(2)** The providing of or failure to provide warnings or instructions.

(*Id.* at 17–18, 21, 32, 35–36.)

**Procedural History**

CIC filed the instant declaratory judgment action on March 9, 2018 seeking relief pursuant to 28 U.S.C. § 2201 to establish the absence of coverage for the Underlying Action. (*See* ECF No. 1.) On September 26, 2019, CIC filed its motion for summary judgment, advancing arguments limited to application of the Policy's exclusions I.A.2.j.(5) and (6) of Form GA 101 12 04, which exclude coverage for damage to "that particular part" of the property upon which the insured was performing operations, and for removal and replacement of defective work. (*See* ECF No. 35-1.) Pro-Tec filed a response in opposition on November 7, 2019 (ECF No. 40), and on the same day Southeastern filed a response adopting Pro-Tec's arguments in favor of coverage for the limited purpose of this declaratory judgment action (ECF No. 41). CIC filed a reply on November 15, 2019. (ECF No. 45.) On November 8, 2019, Pro-Tec filed its motion for summary judgment, advancing essentially the same arguments presented in its response in opposition to CIC's motion for summary judgment—namely, that the scope of exclusions j.(5) and (6) is too narrow to apply to the underlying facts at issue, and/or that the exclusionary language is ambiguous. (*See* ECF No. 43-1.) Southeastern filed a response in support on November 11, 2019 (ECF No. 44), and CIC filed a response in opposition on November 22, 2019 (ECF No. 47). Pro-Tec filed a reply on December 2, 2019. (ECF No. 48.) This matter is ripe for review and the Court now issues the following ruling.

## LEGAL STANDARD

**Summary Judgment**

The Court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the Court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654,

655 (1962). "Summary judgment is proper only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987). The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

**South Carolina Insurance Law**

In South Carolina, "[i]nsurance policies are subject to the general rules of contract construction," and the "cardinal rule of contract interpretation is to ascertain and give legal effect to the parties' intentions as determined by the contract language." *Auto Owners Ins. Co. v. Benjamin*, 781 S.E.2d 137, 141 (S.C. Ct. App. 2015) (quoting *Whitlock v. Stewart Title Guar. Co.*, 732 S.E.2d 626, 628 (S.C. 2012)). "Courts must enforce, not write, contracts of insurance, and their language must be given its plain, ordinary and popular meaning." *Id.* Where the terms of an insurance policy are ambiguous or conflicting, courts must construe those terms "liberally in favor of the insured and strictly against the insurer." *Id.* In other words, "where policy provisions may be reasonably interpreted in more than one way, the court must use the interpretation most favorable to the insured." *CAMICO Mut. Ins. Co. v. Jackson CPA Firm*, No. 2:15-cv-1823-PMD, 2016 WL 7403959, at *8 (D.S.C. Dec. 22, 2016) (citing *State Farm Fire & Cas. Co. v. Barrett*, 530 S.E.2d 132, 136 (S.C. Ct. App. 2000)). "'[T]he Court will look to the reasonable expectations of the insured at the time when he entered into the contract if the terms thereof are ambiguous or conflicting, or if the policy contains a hidden trap or pitfall, or if the fine print takes away that which has been given by the large print.'"

*State Farm Fire & Cas. Co. v. Morningstar Consultants, Inc.*, C.A. No.6:16-cv-01685-MGL, 2017 WL 2265919, at *2 (D.S.C. May 24, 2017) (quoting *Bell v. Progressive Direct Ins. Co.*, 757 S.E.2d 399, 407 (2014)) (alteration in original). However, "[this] doctrine is not a rule granting substantive rights to an insured when there is no doubt as to the meaning of policy language," *id.* (quoting *Bell*, 757 S.E.2d at 407), and "the insurer's duty under a policy of insurance . . . cannot be enlarged by judicial construction." *Id.* (citing *S.C. Ins. Co. v. White*, 390 S.E.2d 471, 474 (S.C. 1990)). "[C]lauses of inclusion should be broadly construed in favor of coverage, and when there are doubts about the existence or extent of coverage, the language of the policy is to be 'understood in its most inclusive sense.'" *Cook v. State Farm Auto. Ins. Co.*, 656 S.E.2d 784, 786 (S.C. Ct. App. 2008) (quoting *Buddin v. Nationwide Mut. Ins. Co.*, 157 S.E.2d 633, 635 (1967)). "Courts should not, however, 'torture the meaning of policy language in order to extend' or defeat coverage that was 'never intended by the parties.'" *Cook*, 656 S.E.2d at 786-87 (quoting *Torrington Co. v. Aetna Cas. & Sur. Co.*, 216 S.E.2d 547, 550 (S.C. 1975)). "The court's duty is limited to the interpretation of the contract made by the parties themselves regardless of its wisdom or folly, apparent unreasonableness, or failure of the parties to guard their interests carefully." *B.L.G. Enterprises, Inc. v. First Fin. Ins. Co.*, 514 S.E.2d 327, 330 (S.C. 1999) (quotation marks, alteration, and citation omitted).

Under South Carolina law, the duty to defend is broader than the duty to indemnify. *Ross Dev. Corp. v. Fireman's Fund Ins. Co.*, 809 F. Supp. 2d 449, 457 (D.S.C. 2011). "If the underlying complaint creates a *possibility* of coverage under an insurance policy, the insurer is obligated to defend." *City of Hartsville*, 677 S.E.2d at 578 (citing *Gordon-Gallup Realtors, Inc. v. Cincinnati Ins. Co*, 265 S.E.2d 38 (S.C. 1980)) (emphasis added). This

District has previously explained, "[T]he duty to defend is triggered where the underlying complaint includes *any allegation* that raises the possibility of coverage." *Auto-Owners Ins. Co. v. Newsome*, No. 4:12-CV-00447-RBH, 2013 WL 3148334, at *4 (D.S.C. June 19, 2013) (emphasis added). An insurer's duty to defend is generally governed by the allegations in the underlying complaint; however, the possibility of coverage may also be determined by facts outside of the complaint that are known by the insurer. *City of Hartsville*, 677 S.E.2d 574, 578 (S.C. 2009) (citing *USAA Prop. & Cas. Ins. Co. v. Clegg*, 661 S.E.2d 791, 798 (S.C. 2008)); *see also BP Oil Co. v. Federated Mut. Ins. Co.*, 496 S.E.2d 35, 39 (S.C. Ct. App. 1998) ("Although the determination of an insurer's duty to defend is based upon the allegations in a complaint . . . in some jurisdictions, the duty to defend will be measured by facts outside of the complaint that are known by the insurer.").

## DISCUSSION

CIC asserts that in order to prevent coverage for business risks the Policy excludes coverage for removal and replacement of defective work. Exclusion I.A.2.j.(6) states that the CGL insurance does not apply to: "That particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it." (ECF No. 35-12 at 21.) Moreover, CIC contends that the Policy also excludes coverage for damage to the property upon which the insured was performing operations. Exclusion I.A.2.j.(5) states that the CGL insurance does not apply to: "That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the 'property damage' arises out of those operations . . . ." (*Id.*) CIC argues that exclusions j.(5) and (6) apply when the claimed damage occurred while the insured was working—whether while the insured was

performing operations (*see Bennett & Bennett Const., Inc. v. Auto Owners Ins. Co.*, 747 S.E.2d 426, 428 (S.C. 2013) (finding exclusion j.(5) applied to property damage to real property on which insured or subcontractors were performing operations and subcontractor was actively performing work by cleaning brick face at the time the damage occurred)), or before the insured completed its work (*see Advantage Homebuilding, LLC v. Maryland Cas. Co.*, 470 F.3d 1003, 1012 (10th Cir. 2006) (finding exclusion j.(6) applied to the cost of repairing or replacing windows that were damaged when subcontractor dropped mortar on them in course of performing its work even though defective work was not discovered until after insured completed homes). Accordingly, CIC asserts that the temporal requirement for the applicability of exclusions j.(5) and (6) is satisfied because the damage to the Blueskin and DensGlass occurred while Southeastern was performing its work installing the stucco.

CIC contends that exclusion j.(5) is broad enough to include not only the specific work an insured is hired to do, but the area an insured damages while performing such work. (*See* ECF No. 35-1 at 13 (citing *Continental Western Ins. Co. v. Shay Constr., Inc.*, 805 F. Supp. 2d 1125, 1132 (D. Colo. 2011) (holding that exclusions j.(5) and (6) applied where insured damaged the work of other trades while repairing its defective work)).) CIC argues that the Blueskin and DensGlass are property upon which Southeastern was working because they are part of the exterior walls. (*Id.* at 14.) CIC further contends that exclusion j.(6) precludes coverage even when the work of another trade is damaged by the insured's work. (*Id.* at 14–15 (citing *Precision Walls, Inc. v. Liberty Mut. Fire Ins. Co.*, 763 S.E.2d 598, 602 (S.C. Ct. App. 2014) (holding, where the insured's scope of work

included taping and sealing blue board insulation, that exclusion j.(6)[5] applied to preclude coverage for the cost of removing and replacing masonry, which had to be removed to gain access to the blue board when the tape failed)).) Thus, CIC argues, if it is true that Southeastern caused the damage to the Blueskin and DensGlass, then the cost of removing the stucco, repairing the substrate, and replacing the stucco is excluded from coverage. (*See id.* at 15–17.)

In its response, Pro-Tec argues that the focus of this case is on the language, "that particular part," in exclusion j.(5). (ECF No. 40 at 5.) Pro-Tec asserts that "the use of the word 'particular' suggests the exclusion should only apply to the smallest unit of division available to the work in question. The 'particular part' language is too limiting to allow the entire property to fall within the exclusion." (*Id.*) In general, Pro-Tec argues that the j.(5) and (6) exclusions limit their scope to damage to the particular part of the property on which the insured is performing work, in this case the component parts of the stucco and nothing else. (*See id.* at 5–11.) Pro-Tec further argues that the exclusionary language, "that particular part," creates ambiguity that the Court must interpret in favor of the insured. (*Id.* at 11.)

The Court agrees with CIC and finds that exclusions j.(5) and (6) apply to exclude coverage of the "property damage" at issue in the Underlying Action. The parties' dispute concerns the *scope* of the exclusions at issue—*i.e.*, how narrowly or broadly they are to be interpreted. Moreover, the dispute is purely legal in nature; there are no material facts

---

[5] In *Precision Walls*, the court referred to the exclusion it was discussing as the "Your Work" exclusion, which confuses a different exclusion with exclusion j.(6). *See* 763 S.E.2d at 600–02. However, the exclusion language that the *Precisions Walls* court quoted was the j.(6) exclusion. *Id.* at 602 ("The exclusion applies to property that must be restored, repaired, or replaced.").

in dispute. First, Southeastern had an explicit contractual duty to protect adjoining surfaces (Schweickhardt Dep. at 57–59, 74; Stewart Dep. at 10, 23–24; Subcontract, ECF No. 1-2 at 3), and the stucco components were affixed to the DensGlass and Blueskin (*see* Schweickhardt Dep. at 42–43 (explaining that when the lath is screwed into the wall it creates incidental holes in the Blueskin, but this is considered normal and not a significant or concerning source of moisture)), so protection of the DensGlass and Blueskin were within Southeastern's scope of work. Next, the Court finds that— interpreting the exclusions as narrowly as reasonably possible—the Blueskin and DensGlass constitute "[t]hat particular part of real property on which [Southeastern was] performing operations," and the evidence of record—filtered through the allegations of the Underlying Action—demonstrates the "'property damage' ar[ose] out of those operations." (*See* Exclusion I.A.2.j.(5), ECF No. 35-12 at 21.) The DensGlass sheathing formed the exterior wall covering over the framing, and the Blueskin wrapped the edges and borders of the door and window openings on top of the DensGlass. (*See* Stewart Dep. Ex. 5, ECF No. 35-8 at 9 (depicting substrate prior to stucco installation).) In other words, Southeastern by necessity had to install its materials "on" the DensGlass and Blueskin in order to complete its stucco installation. This is the only reasonable construction of the exclusionary language in j.(5) as applied to the underlying facts.

The analysis need go no further. If Southeastern did not cause the damage to the DensGlass and Blueskin, then coverage under the Policy does not apply and CIC has no duty to indemnify. If Southeastern caused the damage, then it happened while Southeastern was performing operations on "that particular part" of the Shipwatch property on which Southeastern was contractually engaged to install stucco. It would

19

strain credulity to divorce the DensGlass and Blueskin from "that particular part" of the property on which Southeastern was performing work. Without the DensGlass there would be no walls on which to install the stucco. The door and window openings were not considered complete without the Blueskin lining being installed to ensure waterproofing. In other words, the DensGlass and Blueskin were integral to the exterior walls on which Southeastern was performing operations. The component materials of the stucco are not "part of real property" until they are installed. Thus, for purposes of exclusion j.(5) and under the instant facts, it would be unreasonable to say that the very materials Southeastern was installing were "real property *on which*" it was performing operations. In contrast, the exterior walls of the condominium buildings—which were necessarily completed prior to installation of the stucco—*were* "part of [the] real property *on which*" Southeastern performed work.

Moreover, CIC is not seeking to apply the "particular part" language to exclude damage to unrelated parts of the *entire* property and it is hyperbole for Pro-Tec to suggest as much. (*See* ECF No. 40 at 5 ("The 'particular part' language is too limiting to allow the *entire* property to fall within the exclusion." (emphasis added)), 7 (citing *Alliance Mut. Ins. Co. v. Dove*, 714 S.E.2d 782 (N.C. Ct. App. 2011) for the proposition that, "If [the insurance] company wants to exclude coverage for property damage to the *entirety* of the property on which its insured performs work, instead of 'that particular part' of the property on which work is performed, it should say so. But the court may not by judicial construction do the job for it." (emphasis added)), 10 (citing *Gore Design Completions, Ltd. v. Hartford Fire Ins. Co.*, 538 F.3d 365, 371 (5th Cir. 2008) for the proposition that, "If work on any part of a property would leave an insured exposed for damages to the *entire* property, the

exclusion should state: 'Property damage to property that must be restored, repaired or replaced because your work was incorrectly performed on any part of it.'" (emphasis added)).) Some of the case law cited by Pro-Tec shows courts wrestling with delineating the boundaries of the phrase "that particular part," and the *extent to which* it limits the scope of the exclusion. But the facts of this case do not require the Court to grapple with those boundaries. This case does not involve alleged damage to the whole property, to neighboring property, or to unrelated building components. Rather, Pro-Tec's claims in the Underlying Action are for damage to the very building components on which Southeastern performed its stucco installation, and which Southeastern was contractually bound to protect while performing that installation—to wit, the exterior walls, which were composed of DensGlass sheathing and Blueskin borders around door and window openings.

Finally, Pro-Tec has not satisfactorily explained why exclusion j.(6) does not apply, given that the DensGlass and Blueskin indisputably had to be repaired due to incorrectly performed work.[6] (ECF No. 35-12 at 21.)The requirement to construe exclusions narrowly in favor of the insured does not and should not operate to transform a CGL insurance policy into a de facto guarantee of a contractor's work. The damage to the DensGlass and Blueskin at issue here, given the putative manner in which it came about, is the type of business risk that courts have held is not covered by CGL insurance. *See, e.g.*, *C.D. Walters Const. Co. v. Fireman's Ins. Co. of Newark, New Jersey*, 316 S.E.2d 709, 711 (S.C. Ct. App. 1984 ("The consequence of not performing well is part of every business

---

[6] Again, if some other entity caused the cuts in the Blueskin and DensGlass, then Southeastern is not responsible and the Policy would not provide coverage. If Southeastern caused the cuts, then exclusion j.(6) applies because the repairs to the DensGlass sheathing and Blueskin membrane were necessitated by Southeastern's incorrectly performed work.

venture; the replacement or repair of faulty goods and works is a business expense, to be borne by the insured-contractor in order to satisfy customers." (quotation and citation omitted)). Therefore, CIC is entitled to summary judgment and the case is dismissed.[7]

## CONCLUSION

After careful consideration of the parties' briefs, the associated record, and the applicable law, the Court hereby GRANTS CIC's motion for summary judgment (ECF No. 35) and DENIES Pro-Tec's motion for summary judgment (ECF No. 43). The Court declares that CIC owes no coverage obligation under the Policy to Southeastern for the Underlying Action. There being no further issues requiring resolution, this action is dismissed.

**IT IS SO ORDERED.**

/s/ Bruce Howe Hendricks
United States District Judge

October 9, 2020
Charleston, South Carolina

---

[7] Pro-Tec's motion for summary judgment is denied for all of the same reasons that CIC's motion is granted, and disposition of Pro-Tec's motion requires no additional discussion.